Argument, Texas Bankers Association v. Consumer Financial Protection Bureau. Mr. Loeb. Thank you, Your Honor. May it please the Court, Robert Loeb on behalf of the Texas Bankers Association and the American Bankers Association et al. As an initial matter, we're in receipt of the CFPB's notice from this morning. We have conferred to some degree, and my understanding from my opposing counsel is that in regard to our pending motion for stay of the compliance deadlines and asking the Court to toll those deadlines, the Bureau's position is now that they will not oppose the tolling of those deadlines, at least until this Court either holds another argument or issues some subsequent order. You can get clarification from them on that. And with that, it's our appeal. This is an important issue to our clients, and I'm going to proceed with the argument and ask for this Court to rule in our favor. This Court should reject the CFPB rule as exceeding the Bureau's statutory authority by requiring the collection and disclosure of pricing information and the collection of the LGBT status of all business owners applying for small business loans. And further, this Court should vacate the regulation in full because it is based upon admittedly flawed cost data. So turning first to the improper requirement of collecting the cost information, when examining the statute at issue here, 1691C2, it's important to recognize that this statute, as the CFPB admits, is modeled on the Home Mortgage Disclosure Act, but with one significant difference, which they also concede, is that the Home Mortgage Disclosure Act at 12 U.S.C. Section 2803, it has an itemized list of things that must be collected and maintained and disclosed, and that contains a very long list of pricing data. It includes the rate, the points, the fees, the charges, the prepayment penalties. But when Congress chose to make a list of collection and disclosure for small business loans, it chose not to include the pricing data. Instead, it specifically limited to information provided on the loan application and as to whether that application was granted or denied and to whether the applicant was within one of three categories, women-owned business, minority-owned, or small business. And that decision by Congress to include it in the Home Mortgage Act but not in the Small Business Disclosure Statute makes perfect sense. The mortgage market is very different than the small business loan market. There, in the mortgage market, pricing is largely public. It is not considered to be sensitive or proprietary. Indeed, you can find it in the newspapers. Of course, Chief Judge Crane put a lot of work into this and did some detailed work on it, and obviously you disagree because you're appealing his ruling. I understand that there are lots of particulars in which you would differ, but just as a general matter, in your view, your client's position, where was it that Chief Judge Crane went wrong in his understanding of the statute? I know that's a broad question and I'm just calling for a broad answer, but you have a lot of details on it. But basically, what caused him to go wrong in your view? Well, I think he failed to adhere to the text of the statute. So subsection H they're relying on is giving them carte blanche to collect this information about pricing information. I mean, he certainly purported to adhere to the text of the statute, as he would normally do. Yes, Your Honor. I have no respect to the district court here, but the language that H is not, it's not a provision on its own. It lives within E2. It is limited by the initial language in E2, which limits it by E1, right? And Congress specifically limited the E2 list to the information that is provided by the applicant under a request under subsection B. So the request under subsection B is the loan request by the applicant, and the information that can be collected and maintained under E2 is that information that comes in the loan application, and the others specify things by Congress, which is the action on the application and whether it's, again, the minority-owned, women-owned, or small business. And the CFPB cannot take subsection H, which gives it authority to get additional information, and treat it as a carte blanche to get what information they want, when the plain text of the statute limits it to the information that has been provided by the applicant in the application, and that's expansive information. What they can't do is go outside of that and say, well, we'd also like to get all the pricing data information that's collected by the lenders. We'd also like to get all information about the LGBTQ status for every small business owner who seeks a loan in America. Those are things that's not contemplated in the statute, Your Honor. Just following up on that. So Judge Smith is rightly focusing on the text. I want to take a step back and look at the structure of it, because I just want to understand your argument. There's several subsections in this statute, 1691C. I read B, E1, and E2 as sort of all hanging together, like self-referring to each other. Is that your argument? Yes. And it's not just reading into it. It's explicit. Yeah, it is. It's explicit. E2 is expressly limited by E1. E1 expressly states it's the data that's been provided by the loan applicant under a request under subsection B. Subsection B references the request for a loan by the applicant, and also says, and the lender is supposed to ask them whether it's a woman-owned, minority-owned, or a small business. So that's the class of information that we're dealing with. My question is, and I think that's a powerful argument from the statutory structure. How do I square that argument with the presence in E2D, where they ask for, I forget the language, is basically what they do with the loan application, what the bank does. Why is that in there? Well, I think to the extent that it's going to be beyond the loan information given by the applicant, it would be whatever Congress specifically states in that section. And there it's still, it's the action on the application. So everything is either information from the application itself, whether the application is granted or not, which is what D is, the type of action on the loan and how much it was granted. If it was granted, that's C right above it. And then, of course, if you look at G, the women-owned, minority-owned, or small business context. And that is everything is harmonious with the language of subsection B and subsection E1. It's either all coming from the application, or it's the action on the application, as it says in B, or it is the status of those three categories alone. And if Congress had intended for sensitive information, you know, so the information about pricing is very different than the home mortgage, which is, like I said, is something you're going to find in the newspaper. In the small business context, that is proprietary confidential information, and everyone understands that. And Congress would have not had that included in this list. First of all, it's very telling. They had it in the home mortgage disclosure. They didn't have it here. But if they were contemplating that was going to be in, the default rule under F2 of the statute wouldn't have been public disclosure. If Congress had contemplated that this statute would also include sensitive pricing information and the LGBT status of all businesses requesting a loan, they wouldn't have had a default rule that any member of the public can come in and shall be given the information by the bank or the lender. So, you know, it's a matter of statutory construction. The text and the context here, and, of course, its relationship to the Home Disclosure Act, shows that this is simply not within what was contemplated by Congress. And so requiring the pricing information is clearly not appropriate. Likewise, the LGBTQ status of the borrower, that fails for the same reason, that it is ignoring the limitations placed on E2, that it's limited to E1 and subsection B. What's your response to sort of the Bostock argument, as I think of it? That Bostock gives us a reason to request the... Congress wanted the demographic information, was very specific about what it wanted here. It wanted the women-owned, the minority-owned, and whether it was a small business or not. And the CFPB concedes that the definition of those terms does not include LGBTQ status. And Bostock is construing a different statute. It's about whether there's discrimination because of sex. So it's looking, again, at whether there is sex discrimination, and that's the method of proving it. But that doesn't give them license to seek whatever information they want, that they think it might be helpful for proving a sex discrimination claim. So Bostock here is simply inapplicable. And I believe some of the executive orders also address that, but that's not really an issue here as to the extent that Bostock applies to other statutes. Well, there is an executive order that speaks to the applicability of Bostock to other sex discrimination. Although you're right, I think, well, I take your point that here we're not, we're dealing with sex discrimination per se, we're dealing with something else. This is not dealing with the sex, this is construing what was required as far as being collected and maintained under this statute of E2. And when Congress wanted to collect information regarding the demographics of the applicants that listed it, and they concede that list does not include LGBT status, and to me it's absurd to think that if Congress wanted to include that and give them the power to demand it, that they would have also had, again, a default rule where that information was publicly disclosed. That makes no sense whatsoever. But in our reading of Subsection 8, it still has capacious powers. There's lots of information that goes into the application. There's all the assets of the borrower, whether they have cash, real estate vehicles, their income, their revenue, their debts, is it secured debt, do they have mortgages? If the CFPB wants to get that information, Subsection 8 allows them to, whatever they think would be helpful, they can seek. What they can't just do is march outside the application and seek whatever other information they want. If there's no further questions on that, I'll just turn to our second argument about the statute, the regulation, I'm sorry, being arbitrary, capricious, and it should be vacated in whole because the Bureau here knowingly used inaccurate and flawed cost data in promulgating this regulation. So under Business Roundtable v. SEC and Chamber of Commerce v. SEC, an agency has an affirmative obligation to evaluate and to take into account economic implications of a proposed rule. And this Court in Mexican Gulf Fishing emphasized that the agency can't just bury its head in the sand as to the costs and benefits, and here cannot just rely on flawed data. That's another way of burying your head in the sand, to the reality of the costs. You're just making a substantive objection, but that's not a procedural objection. The agency went through some pretty convoluted, complex procedures here in terms of timing and substance. Your Honor, our argument is arbitrary and capricious to promulgate this regulation knowing that you're doing it based on flawed and inaccurate data. So the Bureau admitted in the record on appeal here that the data they used for costs was based largely on the home mortgage market, which they admitted in the record, if you look at Record 2072, they admit that that market is very different than the small business market loan. And, indeed, the mortgage—a lot of these are just mortgage companies. That's all they do. It's all automated. The costs are very simple. It's efficient. The small business loan, every loan is very particularized. They don't have sophisticated computer systems. Some of these offices only have two employees or six employees, et cetera. So the costs that are imposed in putting these rules on the small community banks, very different than the mortgage market. They concede that, yet they relied on the costs that have nothing to do with small business loans. They said, well, we relied on a survey, but they admitted page 2074 and 2070 that their survey didn't even take into account the costs of the very same data points that they're requiring here. Instead, they only looked at the statutory mandatory points. So they never even collected data of the costs they were imposing by their own regulation. So to say that they looked at the costs is they collected costs based on something that had nothing to do with small business loans, and they collected costs, and from this panel, which again examined costs that had nothing to do with the regulation they actually enacted, and all these data points that they're now imposing on these small lenders all across America. And in their own brief, if you look at page 46, they concede that the data they got was limited and unrepresentative. Again, they point to the panel and to the survey, but the survey is not actually taking account of the costs they're imposing by the regulation. That is a violation of the Round Business Table case, the Chamber of Commerce case, the Mexican Gulf fishing case, et cetera. And they admit in their brief at page 46 and in the Federal Register at 88 Federal Register 35509 that they failed to take into account the firewall costs. So they're supposed to create a firewall between whether you're a minority or women-owned business and the person who's actually deciding whether to grant the loan, and that means creating separation in different computer systems or something. And they said they didn't take it into account. They concede that in both places. And the comments they got said that's a serious cost, especially for the small community banks. And their response is to shrug their shoulders and say, well, we didn't take into account too bad. That's arbitrary and capricious. That's one of the major costs here. And they say, well, you know, if a bank thinks it's unfeasible or a lender thinks it's unfeasible, there's an exception in the statute for that. But, first of all, no one's going to rely on that without them explaining what unfeasible is. And, second of all, one of their jobs here was to exempt out. And they did exempt certain lenders of certain size and certain number of loans. But they can't decide which banks to exempt and how far without getting accurate information. And one of the big costs, again, was this firewall. They might have told a class of banks once they understood the cost that they were imposing with the firewall. And it was arbitrary and capricious for them to rely on this flawed and inaccurate data knowing that it was flawed and inaccurate. They were well aware. So look at page 2070 of the record on appeal. This is in their own words. Well, they recognized another office of the federal government told them that the cost estimates were too low. And that other agency, which was the Small Business Administration Office of Ad Kaseeman, that is not a private group. The head of that office is appointed by the President of the United States. They told them that their estimates were too low. And they cited the failure to account for the small loans. And they pointed to the information from the trade groups that showed the flaws and inaccuracies in the cost data. And what does the Bureau say in reaction to that at page 2070? The Bureau acknowledges these limitations. They say, we can just move ahead, even though we are collecting information that is only pertaining to big banks and only pertaining to mortgages. That is simply arbitrary and capricious. So the information was both recognized and it was well spelled out in the comments. So the comments by the Small Business Administration Office of Advocacy, that can be found at page 2885 through 2887 of the record on appeal. There, this other agency of the federal government, office of the federal government, is telling them this cost information is crucial to the nature and extent of these regulations you are promulgating. And you need to assess the economic, with accurate cost information. And the SBA highlighted the concerns of failing to account for the requirements of getting computers, about hiring new people, the basic costs these small community banks were going to have to bear, that they didn't take them into account. And the SBA office noted that the trade associations may be submitting what was going to be authoritative information that the CFPB could rely on. And there was no reason for this CFPB not to at least wait for that additional authoritative information. Instead, they knowingly proceeded with the flawed, inaccurate information. And that is just, I think, the definition of arbitrary and capricious. You mentioned costs. I mean, to the extent that there's a, I guess there's still a stay motion pending before our panel. Could you talk about irreparable harm? Well, the, we have thousands of members, you know, including numerous small community banks, and they need to, they're very nervous about beginning to like start to comply with these rules, which are going to require significant computer investment, personnel investment, training, et cetera. And that's for them, you know, as the CFPB's own rules recognize that this is going to be imposing tens and hundreds of thousands of dollars of costs upon them. And so they're, you know, anxiously awaiting the outcome of this hearing to know whether they need to make those investments, because the compliance deadline is coming up. When is that? It depends on the size of the compliance. So the CFPB extended it to July for some institutions and for some, depending on size, it's either in January or October of the following year. But at this stage, you know, these organizations need to make hiring and investment decisions about the computer systems, the software that they would have to purchase and the training on that. And they need to have guidance from this court, you know, what rules are going to apply moving forward. And now we have the CFPB at least this morning, and they can clarify to you that they don't oppose our motion for a stay, at least until some further order by this court. And that would be at least some temporary relief. But we would ask this court, this is, you know, this is our appeal. We have a right to have it heard that this court move forward and strike down this regulation, at least as to the pricing information and to, and as to the LGBT status of all the small business borrowers around America. But also should vacate the regulation in full based upon it being arbitrary and  We reasonably though should wait, should we not, to see what position, if any, the agency might state in the next few days or weeks or see what kind of leadership change there is before we might know what is still at issue. If they're telling you they're moving ahead to revoke the regulation and that they're going to toll the deadlines in the interim, we'd be fine with that. But I think anything short of that, we would need to have some, this case move forward to determination. So, you know, you can maybe put some deadline as far as for them to give you a further report as to what their plans are regarding the regulation in this case. But yeah, we're not trying to, you know, this is an important issue. We need resolution of it. If they're withdrawing the regulation would certainly give us the relief that we want. But it's something that can't just be waved away. There's a process for removing the regulation. We have to know that they're entering that process. And if there's no further question, I'll reserve the rest of my time. Yes, thank you, Mr. Lewis. Mr. Gordetsky. Ms. Gordetsky, excuse me. Thank you. Yes, Lauren Gordetsky on behalf of the CFPB. As noted. Let me just say we don't expect or wish for you to say anything that you're prohibited from saying. We understand that lawyers get in tough situations sometimes with their clients. We may have some questions of you procedural or otherwise. But say what you think you need to say and then we'll proceed from there. Thank you, Judge Smith. As we noted in our notice, we were informed this morning of a change in leadership and that we were not to take any position in court other than to request a pause in proceedings. And so as Your Honor just noted, we would request a pause sometime for the agency to gather more information from leadership to take a position going forward. And as opposing counsel stated, we have conferred with them and we do not object to either a stay or a tolling of the compliance deadlines to align with whatever this court decides for a future date. I was on a panel this morning in a different case, but same kind of letter about quote a pause. So is there an operational definition of what pause means? I don't have anything further to clarify at this time. I can note that since this morning's proceedings that the Treasury Secretary was named the acting director. And in the time since then, we've also gotten authority, at least for this case, to agree to extend. So that's what we've been able to discuss since then. And, you know, as we gain further information, we can inform the court. We should reasonably expect, probably, as I think Judge Smith adverted, at some point more sooner than later, we'll know through the parties whatever remains before us. Would that be probably the case? I don't mean today, but unlike many of our cases that kind of hang out there forever, this seems to be on a quicker track. Yeah. I understand your question, Judge Stewart. And I can't say with any definition today, but we will act with all deliberate speed to get further clarity. Are you able, then, to give us anything in writing regarding, in particular, your non-opposition to a stay or a tolling of the deadlines or anything else that you've told us? It would be helpful to have that committed to a written notice. Of course, Judge Smith. We would be able to do that after this proceeding, conferring with opposing counsel and submit that. Any other questions? No, thank you. All right. Thank you. Thank you. Mr. Loeb, do you have any response or anything to add in terms of what we need to do in the immediate future? I would just note, because Judge Stewart was on the earlier case, that this case is in a different posture than the earlier case. The earlier case, the CFPB was the appealing party. They had lost, so the status quo was their policy that was being challenged was not in effect. Here we have the status quo as this rule being fully in effect with all these dates out there, so that, I think, makes the difference. I wasn't suggesting the cases were the same, because as you pointed out to your appellant, I was just noting the words pause existed in both cases. That was the only similarity. In one situation, the pause would be not prejudicial to the other party, but here, a long pause, like you said, we'd expect some prompt answer. Also, in that other case, it wasn't a regulation. It's something that the director can just wave away and the policy be gone. Here is a regulation. We need to know they're actually engaging the process of actually withdrawing the regulation. And with that, I thank the Court. All right. Thanks to counsel for your appearance, and we will proceed as we think best, and the Court is in recess.